**LOTUS DEVELOPMENT CORPORATION,**
Plaintiff,

v.

**BORLAND INTERNATIONAL, INC., Defendant.**

Civ. A. No. 90–11662–K.

United States District Court, D. Massachusetts.

March 20, 1992.

James C. Burling, Jeffrey B. Rudman, Hale & Dorr, Boston, Mass., Henry B. Gutman, Kerry L. Konrad, O'Sullivan, Graev & Karabell, New York City, for plaintiff.

Laura Steinberg, Sullivan & Worcester, Boston, Mass., Lynn H. Pasahow, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., David L. Hayes, Fenwick & West, Gary L. Reback, Wilson, Sonsini, Goodrich & Rosati, Mitchell Zimmerman, Fenwick & West, Polo Alto, Cal., Peter Erich Gelhaar, Donnelly, Conroy & Gelhaar, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

KEETON, District Judge.

In this civil action, the plaintiff, Lotus Development Corporation ("Lotus"), seeks damages and equitable relief for alleged infringement by defendant, Borland International, Inc. ("Borland"), of the Lotus copyright in its computer software program, Lotus 1-2-3. This is the same copyright for the infringement of which Lotus has obtained relief under this court's decision in *Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F.Supp. 37 (D.Mass. 1990) (holding that Paperback's VP Planner was an infringing software product).

Lotus contends that on undisputed facts Borland's Quattro and Quattro Pro (herein, collectively, the "Quattro programs") are likewise infringing. Borland responds that its products are materially different from both Lotus 1-2-3 and VP Planner and that the court should determine on undisputed facts that the Quattro programs do not infringe the Lotus copyright. Borland argues that this result follows under the rules and standards of law applied by this court in *Lotus v. Paperback*, In the alternative, Borland contends that this court should reconsider its rulings of law in the *Paperback* case and now hold that the elements of Lotus 1-2-3 it determined previously to be copyrightable are not copyrightable. Also, Borland contends that in any event it has valid defenses that Paperback did not have.

Pending before the court are cross-motions for summary judgment, fully briefed and with factual submissions complete except for confidential materials to be presented to the court pursuant to a stipulation and protective order.

For the reasons explained in this Memorandum, I conclude that neither party's motion is supported by the record now before the court.

The primary contention of Lotus that Borland copied the Lotus user interface as a whole fails because there is a genuine dispute of fact as to whether Borland did so. Borland's primary contention that it is entitled to a summary judgment on copyrightability fails on legal grounds for reasons explained in Part VI of this Memorandum.

Each party has advanced alternative contentions for summary judgment. Each of the submissions before me, however, fails to meet the movant's burden of identifying both a clearly stated legal theory and a clear statement of undisputed facts sufficient to demonstrate an entitlement to summary judgment. In these circumstances, I conclude that it is appropriate to deny the cross-motions for summary judgment. Explicitly, however, I do not preclude the filing of another motion by either party if one can be presented consistently with the rulings stated and explained in this Memorandum.

## I. *Redacted Submissions*

Redacted submissions (Docket Nos. 141 and 147 and certain affidavits, declarations, and exhibits) now before the court were filed pursuant to this court's practice (for the protection of parties, counsel, and court personnel from risks of inadvertent disclosure) not to allow protected materials to be filed with the Clerk before the judge (not any other person acting under a delegation of authority) has approved in writing the specific filing.

In this instance, I have concluded that the description of the protected materials, appearing in the redacted filings, is sufficient for me to determine that they are not material to any of the rulings stated and explained in this Memorandum. If counsel think otherwise, however, they may, with notice to the court and opposing counsel, bring the protected materials to the next scheduled conference to be presented to the court for examination during that conference. In light of this ruling, the parties' motions regarding the submission of confidential documents (Docket Nos. 140, 156, and 160) are dismissed as moot.

## II. *Disposition of the Cross-Motions for Summary Judgment*

This court held in *Paperback* that the 1-2-3 user interface, taken as a whole, was copyrightable. That ruling was never appealed or vacated and continues to have the limited precedential force of a district court decision. The applicability of that precedent to this case is disputed, however, because Borland contends that its allegedly infringing products are materially different from VP Planner (the computer work involved in *Paperback*). VP Planner has been described, both in and outside this court, as an imitation (or look-alike, or clone) of 1-2-3. The conclusion that the user interface of 1-2-3, as a whole, was copyrightable was outcome determinative as to a computer work like VP Planner because, without dispute, the 1-2-3 user interface as a whole was copied. Lotus has maintained, however, both before this court and elsewhere that there is a distinction between imitations of 1-2-3 and other products such as Microsoft Excel.

In the present case, unless other issues are dispositive, it will be necessary to determine on which side of an unmarked boundary, between imitations of 1-2-3 and products such as Excel, the Quattro programs fall. I cannot determine on the record before me that the "1-2-3 interface" (also called the "emulation interface") of the Quattro programs is indisputably an imitation of the 1-2-3 user interface. Thus, for Lotus to meet its burden of showing entitlement to a summary judgment of infringement it must (a) identify expressive elements in 1-2-3 that were indisputably copied in the Quattro programs, (b) establish that those expressive elements, either separately or together, are as a matter of law copyrightable, and (c) establish that the copied expressive elements of the Quattro programs' emulation interfaces are substantially similar to copyrightable elements of the 1-2-3 interface.

The conclusion that the user interface as a whole is copyrightable (which this court reached in *Paperback*) does not resolve the further questions that may now have to be resolved regarding the copying and copyrightability of individual parts or a sum of parts less than the user interface as a whole. The Lotus motion and supporting submission fail to focus precisely, even in the alternative, any claim of copyrightability and undisputed copying of something less than the user interface as a whole. In these circumstances, having concluded that the claim of copying the user interface as a whole has not been demonstrated, I must

conclude also that Lotus has failed to demonstrate it is entitled to summary judgment.

■ Similarly, Borland has failed to demonstrate support for its contention that, even if it copied something from 1–2–3, nothing Borland copied was copyrightable. As far as I am now able to determine, a factfinder may find on disputed evidence that Borland copied the 1–2–3 user interface as a whole. I have previously determined, and as explained in this Memorandum now adhere to the view, that the 1–2–3 user interface as a whole is copyrightable. Moreover, the present record suggests that a factfinder surely could find that Borland copied some expressive elements of the 1–2–3 user interface. The outcome of this case may depend on a more precise focus than Borland has presented as to what elements Borland copied and whether one, or more, or some set or sets of those elements are copyrightable.

■ One effective way of focusing contentions and considering whether they present genuine disputes of fact that are material under the court's resolution of contested issues of law is to consider how any fact questions might be framed for the factfinder's consideration. Especially is this so when a demand for jury trial has been filed. Questions to be submitted to the jury must at some point during full preparation for trial be framed precisely. The trial judge and trial lawyers may well commence this task early, to aid as well the focusing of arguments on motions for summary judgment. A lawyer who contends that a genuine dispute exists as to some material fact should be able to frame clearly a "written question[ ] susceptible of categorical or other brief answer," proposed for use in a "special verdict," Fed.R.Civ.P. 49(a). If, when challenged to do so, counsel cannot state precisely any proposed question of fact that is disputed and material, summary judgment is almost certainly appropriate. If, on the other hand, counsel can frame even a single disputed and material question of fact, summary judgment is inappropriate.

On the present submissions, I am not able to conclude that either party has met its burden of showing a basis for summary judgment in its favor. I therefore deny the motions at this time; however, I conclude that it is appropriate to allow the parties an immediate opportunity to focus their arguments more precisely, on the chance this may lead to disposition without the high costs of trial, and in any event will better focus issues for trial if a trial is necessary. Therefore, I deny the motions now before me, but will allow each party, on the schedule stated below, to file a new, better focused motion if the party concludes it can surmount the serious obstacles identified in this Memorandum.

The claims and defenses in dispute in this case present issues of law and issues of fact that are independently complex. The relationships among the law and fact issues dramatically enhance complexity. A jury demand and the resulting need for clear and explicit explanations to jurors of the law they need to understand in order to identify and resolve material disputes of fact produce still more consequences of significance, and perhaps more complexity as well. Complexities and their consequences have significant implications for fundamental issues of fair adjudication. They present also some pragmatic issues of case management in both pretrial and trial proceedings. The Order entered at this time is aimed at creating a context in which the parties and their attorneys will have incentives to use their adversary presentations in ways that will better focus and illumine issues for the decisionmakers, judge and jury, and will save the parties, their counsel, and the public from needlessly excessive litigation costs. Suggestions of counsel in aid of this aim are invited and encouraged.

III. *Entanglement of Law and Fact as to Copyrightability and Substantial Similarity*

A. Basic Methods of Separating Law and Fact

■ In general, an issue of law is decided by a court—not by a jury in a jury trial and not by a trial judge as factfinder in a

nonjury trial. Also, in general, if reasonable persons can differ about how a fact question should be decided on the evidence received in the trial, the jury decides it in a jury trial, and the jury decision is final; in a nonjury trial, the judge as factfinder decides, and the decision is subject to review under a deferential standard, Fed. R.Civ.P. 52(a) (findings sustained unless "clearly erroneous").

■ These clear and straightforward rules sometimes require supplementation, however, when the issues of law and fact are "mixed." If a court can clearly separate law from fact, it may use either of two basic methods of submitting questions to a jury. One method asks the jury to answer a mixed law-fact question; the other, a strictly factual question.

Under the first method, the court submits a combined law-fact question to the jury. To use this method properly the court must first decide the issues of law so it can give the jury clear instructions on the law. The jury's answer, if they discharge their responsibility well and truly, decides only fact questions even though their answer is in form an answer to the mixed law-fact question.

This first option may be used either for a "special verdict" under Rule 49(a), or for a "general verdict accompanied by answers to interrogatories" under Rule 49(b) of the Federal Rules of Civil Procedure.

The second option open to the trial judge is to frame "special questions" for the jury under Rule 49(a), or "interrogatories" under Rule 49(b), that ask only fact questions, not mixed law-fact questions.

A charge that directs the jury to return only a general verdict cannot use the second method because the general verdict is necessarily a mixed law-fact finding (the type required under the first option). Thus, a verdict "for the plaintiff" or "for the defendant" does not provide any basis for a reasoned determination by the court that the verdict rests on findings of fact supported by evidence and not on a different view from that of the court about the legal elements of mixed law-fact determinations.

■ If only a "special verdict" under Rule 49(a) is to be returned, and the questions are well framed, the jury need not have any explanation of the legal rule or rules the court will apply to determine what judgment to enter in view of the jury's findings. The judge may choose to explain anyway, but giving the explanation is a matter of choice rather than necessity.

■ When two or more questions of fact must be submitted, the court may submit one or more questions by one of these methods and one or more by the other. Also, the court may use a mixture of general verdict and "interrogatories," Fed. R.Civ.P. 49(b).

■ When issues of law and fact are easily separable, the court, when it perceives a need to do so to avoid jury confusion or bias, may use a "special verdict" form under Rule 49(a) that strictly submits fact questions; also, the court may cleanly separate the hearings before the court on the legal issues from those before the jury on the fact questions. A key purpose of trying a case in this way is to reduce the risk that the jury will be improperly influenced by evidence and arguments not admissible in relation to the strictly factual issues submitted to them.

■ When law and fact are not easily separable—regardless of how deep the entanglement may be—it nevertheless remains exclusively the responsibility of the court to decide the legal questions.

Ordinarily, it is the responsibility of the factfinder (jury or, in a nonjury case, trial judge) to decide the fact questions, but exceptions exist, as will be noted in Parts IV, VI, and VII below.

## B. Problems of Entanglement

In order to use a strictly factual special verdict form, a court must cleanly separate law from fact. Not all mixed questions of law and fact can be easily separated. Indeed, there may be instances in which law and fact are so deeply intertwined that, at least as a practical matter if not strictly in principle as well, total separation cannot be

achieved. In copyright cases, is "substantial similarity" such an instance? Is "copyrightability" such an instance?

### 1. Substantial Similarity

"Substantial similarity" is not consistently used with a single, settled meaning. In the law of copyright this phrase is used in at least two distinct senses. For this reason, the use of the term "substantial similarity," absent some contextual guidance, may be very misleading.

■ As part of its prima facie case, a plaintiff must prove substantial similarity between copied copyrightable elements of the copyrighted work and expressive elements of the allegedly infringing work. "Substantial similarity," as used in this statement, indicates a degree of similarity between the allegedly infringing material and what is copyrightable (that is, the copyrightable part or parts). It is not enough for a plaintiff to prove great similarity of the allegedly infringing work to uncopyrightable parts of the copyrighted work.

■ The similarity to copyrightable parts, it is said, must be such that an "ordinary observer" would find that there has been "unlawful appropriation." *Concrete Machinery Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 608 (1st Cir.1988). Thus, the copying must be extensive enough to be "substantial." This is "substantial similarity" in a mixed law-fact evaluative sense. Thus, the test for determining whether there is "substantial similarity" in this sense involves not merely a ministerial task of measuring by a yardstick or word count, but a judgmental task of weighing the quantitative measurements along with other relevant factors and coming to an overall evaluation that applies a legal test for "unlawful appropriation" to the facts.

■ The plaintiff must also demonstrate copying of the copyrighted work. Unlike patent law, copyright law never determines that an infringement occurs merely because two works are similar, or even identical, so long as the works are independently created. Therefore, to be success-

ful, a plaintiff must demonstrate that the defendant had access to plaintiff's work. Such access is not disputed in this case. Nevertheless, to prove copying, plaintiff must show more than access. Copying can, of course, be proved directly, and there is some direct evidence of copying in this case. However, once access is proved, copying can also be proved by demonstrating "substantial similarity." In this context, "substantial similarity" simply means sufficient similarity of a given element of a work to an element in the allegedly infringing work to support a reasoned inference that more probably than not the element was copied from the copyrighted work. This is not similarity in a mixed law-fact sense that includes being similar enough to constitute "unlawful appropriation." Rather, the elements of the copyrighted and allegedly infringing work must be shown to be substantially (i.e., notably) similar in a purely factual sense. This is "substantial similarity" in an evidentiary sense. "Substantial similarity" in this sense is one kind of circumstantial evidence of copying.

In this Memorandum, I will try in each instance to indicate clearly (by explicit statement, by context, or by both) to which usage of substantial similarity I am referring.

### 2. Consequences of Entanglement

The complexity introduced by the entanglement of law and fact, bearing on "substantial similarity" (in the mixed law-fact evaluative sense) and on copyrightability has important consequences, including distinctive problems of adjudication and case management both during pretrial proceedings and during trial. Some of these consequences are relevant to the present case.

First, fashioning appropriate verdict forms and instructions to the jury is more difficult when law and fact are so entangled that the usual mode of stating an issue is in the mixed law-fact form.

Second, determining the scope of evidence that is admissible in relation to questions to be decided by the factfinder (jury or trial judge in a nonjury case) is far more

difficult. Moreover, failure of the trial judge to resolve problems of admissibility, especially in relation to proffered expert opinion testimony, may substantially impede fair trial because of risks of jury confusion and the incentives to counsel and experts to try to influence the jury with arguments on the law cast in the form of opinions on the mixed law-fact questions.

Third, when the applicable law requires the application of a standard for decision-making that is derived from a congressionally mandated accommodation among conflicting public policy interests and thus "reflects a balance of competing claims upon the public interest," *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 431, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984), consequences of the first and second types are enhanced, sometimes beyond measure. Difficult as the task of applying that balance in particular cases may be, however, it is not open to a court to ease the task either by revising that balance, *Feist Publications, Inc. v. Rural Telephone Service Co.*, — U.S. ——, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), or by leaving the jury free to revise that balance. A congressionally mandated balance must be respected by courts and juries alike.

The mixed law-fact evaluative "substantial similarity" issue in copyright law inevitably produces the first and second of these types of consequences, and in particular cases may produce the third as well unless effective measures of judicial control are used. For example, consider whether or not expert opinion evidence about the ways in which two computer software programs are similar and dissimilar should be heard by a jury. One may argue for a negative answer under the authority of *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 608 (1st Cir.1988) (substantial similarity is to be judged under the "ordinary observer" test "unaided by expert testimony"). Even if it may be appropriate and useful to a jury in understanding purely historical facts about characteristics of computer programs to hear expert opinions bearing on historical facts, still opinions that explicitly or implicitly depend on policy

premises inconsistent with the law (as determined by the trial judge, subject to correction on appeal) should not be heard by the jury.

Affidavits of experts and arguments of counsel before me in this case illustrate the risks of contentious and potentially unfair proceedings incident to the strong tendency of witnesses and lawyers to intertwine every statement about factual similarity with opinions and arguments about what is, or even should be, the kind of similarity that is legally significant. These opinions are, of course, opinions on the law. Allowing a jury to hear them expressed by witnesses and lawyers is fundamentally inconsistent with the rule that jurors take their instructions on the law solely from the court.

I will return to the issue of "substantial similarity" in the mixed law-fact evaluative sense in Part IV, below.

### 3. Copyrightability

Issues of "copyrightability" in computer software programs present the third type of consequence of entanglement of law and fact in a dimension so extreme that the problem is appropriately viewed as one different in kind and not merely degree. This is one reason, though not the only one, for concluding that at least in the present case, and perhaps more generally, all questions of law and fact bearing on copyrightability of elements of a computer software program are to be decided by a court, not a jury. That issue is considered more fully in Parts IV, VI, and VII, below.

### IV. Entanglement of Copyrightability and Substantial Similarity

The complexity of entanglement of issues in this case extends not only to issues bearing only on copyrightability, and to issues bearing only on substantial similarity in the mixed law-fact evaluative sense, but also to the interdependence of copyrightability and substantial similarity.

The point is illustrated by Borland's argument that Borland is entitled to summary judgment *on the issue of copyrightability*, Docket No. 141, at 1 (emphasis added), because the elements of Quattro

and Quattro Pro that are alleged to be *substantially similar* to elements of Lotus 1–2–3 concern only the way certain parts of the programs function, not copyrightable expressions. *Id.* at 4–8.

Borland argues that *Concrete Machinery*, 843 F.2d at 600, requires that issues of substantial similarity be addressed first, to determine whether "there are sufficient articulable similarities to justify a finding that the defendant has copied from the protected work." Borland's Memorandum, Docket No. 141, at 114 (quoting *Concrete Machinery*, 843 F.2d at 608) (citing *Arnstein v. Porter*, 154 F.2d 464 (2d Cir.1946)). (In this argument, one may note, Borland is using "substantial similarity" in the evidentiary sense.) Then, Borland argues, "the court must determine whether the copying is sufficiently substantial to constitute 'unlawful appropriation' ('illicit copying')." *Id.* at 114 (quoting *Concrete Machinery*, 843 F.2d at 608). (This argument, it may be noted, focuses both on a strictly factual question about copying and a mixed law-fact question about whether the copying is sufficient to constitute "unlawful appropriation.") "Assuming copying of protected aspects is established, the trier of fact can then assess pursuant to the 'ordinary observer' test whether there is substantial similarity between the protected expression and the accused work." *Id.* (quoting *Concrete Machinery*, 843 F.2d at 609).

The first step formulated in the *Concrete Machinery* opinion may be perceived as itself composed of two parts—determining what are the "protected aspects of the copyrighted work" (that is, the "copyrightability" issue) and determining whether there has been copying of one or more of those aspects. It is not clear that one of these two need precede the other in an analysis of the evidence and arguments presented to a court. Indeed, they may be sufficiently interrelated that in most cases they are best addressed together—a possibility at least suggested by the First Circuit's combining the two into the first "step" of its "two-step" test.

 In any event, the argument that First Circuit precedent *requires* a particu-

lar order of analysis of a given problem is contrary to a substantial body of precedent in the circuit. For example, the First Circuit spoke quite early to make clear, in the context of discrimination cases, that the factors analysis set forth in *McDonnell–Douglas Corp. v. Greer*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is intended as a useful guideline and not a mandatory straitjacket. *See, e.g., Dance v. Ripley*, 776 F.2d 370, 373 (1st Cir.1985) ("This circuit, along with other circuits, has rejected the argument that *McDonnell Douglas* and [*Texas Dept. of Community Affairs v.*] *Burdine* [450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980)] set forth a 'rigid, three-step proof process in Title VII cases.'") For like reasons, I conclude that the pattern of analysis and decisionmaking presented in *Concrete Machinery* is not meant to be a straitjacket. Thus, I conclude that the order of addressing the various elements of a prima facie case fashioned in *Concrete Machinery* need not be applied to a case in which there are compelling practical reasons for a different order of proceeding.

Perhaps the procedure discussed in Part V, below, fits the *Concrete Machinery* model because the "first" step of that model is itself two-fold, as noted above. In any event, regardless of whether the procedure discussed in Part V precisely fits the *Concrete Machinery* model, I conclude, for reasons explained in Part V, that it is appropriate to consider an order of proceeding in this case that places issues of substantial similarity (in the evidentiary sense) ahead of issues of copyrightability.

### V. *Sharpening the Focus*

In this case, if it is determined that neither a motion for summary judgment nor a motion for directed verdict should be sustained, how might issues involving substantial similarity (in the evidentiary sense) be submitted to the jury in a verdict form in the trial of this case?

To establish infringement, Lotus must prove, either directly or circumstantially, that Borland copied. Circumstantial proof of copying is made by showing access to the copyrighted work and substantial sim-

ilarity (in the evidentiary sense). In the present case, I conclude that a reasonable trier of fact could find that the Quattro programs' user interfaces were not copied in their entirety from Lotus 1–2–3. However, because access is admitted, the record before me contains both circumstantial proof of copying (e.g., all of the commands in the Lotus 1–2–3 menu structure appear verbatim in the Quattro programs' menu structures in similar hierarchies) and direct proof of copying (e.g., Borland named certain files involved in the 1–2–3 emulation "123.rsc" and "123.mu"). It does not necessarily follow, however, that a jury must on this record find that some particular element was copied from Lotus 1–2–3 rather than being either independently created or copied from some other source.

For any elements of 1–2–3 that Lotus wishes to argue were copied, Lotus must demonstrate (either beyond dispute on motion for summary judgment, or else at trial by a preponderance of the evidence) that the alleged copying from 1–2–3 occurred. Lotus may do so either directly or circumstantially. To demonstrate that the copying was illicit Lotus must also show substantial similarity in the mixed law-fact evaluative sense and copyrightability of those elements.

Returning to the question posed above (How might issues involving substantial similarity in the evidentiary sense be submitted to the jury?) I take note that one option to be considered is to begin with the less complex issue of copying and with a broad focus, then moving toward narrower questions concerning what elements of Quattro or Quattro Pro were copied from 1–2–3.

Would it be appropriate to frame the first question on a Verdict Form in a way such as this (with a similar question to follow for the other allegedly infringing work)?

**Question 1**

(a) Do you find that the Quattro Pro user interface as a whole was copied from the Lotus 1–2–3 user interface as a whole?[1]

_____YES _____NO

(b) Do you find that the part of the Quattro Pro user interface called the "emulation interface" (also called the "1–2–3 compatible interface") as a whole was copied from the Lotus 1–2–3 user interface as a whole?

_____YES _____NO

(c) If NO, do you find that some part, and, if so, which of the following part or parts of the Lotus 1–2–3 user interface were copied into some part of the Quattro Pro "emulation interface" (also called the "1–2–3 compatible interface")?

| | | | |
|---|---|---|---|
| (1) | The menu commands | _____YES | _____NO |
| (2) | The menu structure | _____YES | _____NO |
| (3) | The command sequence | _____YES | _____NO |
| (4) | The long prompts | _____YES | _____NO |
| (5) | The macro facility | _____YES | _____NO |

To avoid any misunderstanding, I state explicitly that I have not determined that the foregoing draft of Question 1 is appropriate for use in this case. Nor have I

---

1. It is not entirely clear that Lotus contends that part (a) of Question 1 should be answered YES, or that Borland contends that a NO answer to part (a) would be material if part (b) were answered YES. Perhaps the parties will agree, or one will persuade the court, that part (a) may be omitted.

determined what, if any, explanatory instructions should be given to the jury along with such a question. Even if a question of this general type is to be used, I will invite submissions by counsel of any different way of framing the question (and associated instructions) and why that different way would be more appropriate. Of course, counsel are invited to submit additional specific elements of alleged similarity about which there is dispute. Also, I do not suggest that all five elements on the present list ought to be included.

In particular, the term "macro facility" is not adequately defined in the parties' present submissions and would require definition. If "macro facility" means some element or characteristic of the user interface distinct from and not including the menu commands, menu structure, and command sequence, Question 1(c) might be appropriate as drafted. If, on the other hand, "macro facility" is to be defined in a broader sense that includes the menu command, menu structure, and command sequence elements, as well perhaps as the long prompts, but does not include other aspects of the 1–2–3 interface and for that reason is not the same as "the user interface as a whole," the foregoing draft of part (c) might be replaced by the following parts (c) and (d):

(c) Do you find that the Lotus 1–2–3 macro facility as a whole was copied into some part of the Quattro Pro macro facility?

_____YES _____NO

(d) Do you find that some part, and, if so, which of the following part or parts of the Lotus 1–2–3 macro facility were copied into some part of the Quattro Pro macro facility?

| | | | |
|---|---|---|---|
| (1) | The menu commands | _____YES | _____NO |
| (2) | The menu structure | _____YES | _____NO |
| (3) | The command sequence | _____YES | _____NO |
| (4) | The long prompts | _____YES | _____NO |

---

The purpose of including these alternative drafts in this Memorandum is to begin the process of focusing issues more precisely.

An advantage of beginning a Verdict Form with a question of this type on the subject of copying is that findings of the jury on the various parts of such a question would enable counsel and the court to focus more precisely on (a) the legal elements of "substantial similarity" (in the mixed law-fact evaluative sense) that are material after taking account of the jury findings, and (b) the legal (and factual, if any) elements of copyrightability that are material after taking account of the jury findings. Surely some of the legal and factual issues that cannot be dismissed as immaterial before taking account of the jury findings would be mooted by the findings. For example, if a jury finds that the emulation interface as a whole was copied from the 1–2–3 interface as a whole, copyrightability questions with respect to less of the user interface than the whole might be moot. On the other hand, if the jury finds that neither the emulation interface nor certain individual elements of it were copied from Lotus 1–2–3, but certain other elements were copied, the material copyrightability questions would be limited, others having been mooted.

I have proposed presenting the question to the jury as one of "copying" rather than "substantial similarity" even though access is undisputed. I have done so because a mere finding of "substantial similarity" in the circumstantial evidentiary sense may be inconclusive on the issue of copying. That is, even if "substantial similarity" in the evidentiary sense creates a presump-

tion of copying, it may be that the presumption is rebuttable and that the jury should be so instructed. If so, Borland might still persuade the jury that the circumstantial inference of copying has been rebutted by extrinsic evidence offered by Borland. I do not at this time decide any of the questions of law suggested in this paragraph.

Consideration may be given to trying Phase One on copying and commencing Phase Two of trial immediately after Phase One, and before the same jury, to address any remaining questions that could properly be submitted to the jury on issues of "substantial similarity" in the mixed law-fact evaluative sense and "copyrightability."

### VI. *Framing the Issues of Copyrightability*

A good place to begin the exploration of potential options in this case regarding submission to a jury of issues of copyrightability (if such issues are to be submitted to a jury) is to consider whether it would be appropriate to submit a single copyrightability mixed law-fact question, framed in terms of the applicable legal standard. Before I suggest such a jury question, I first state the standard for deciding copyrightability that will be used in this case, absent further guidance from higher authority before the date of trial.

### A. The Standard for Deciding Copyrightability

Having fully considered the submissions now before the court, I conclude that, for reasons stated in the *Paperback* Opinion, 740 F.Supp. at 54–62, and supplemented here, the copyrightability issues in this case should be determined by the legal standard used there and summarized as follows:

FIRST, in making the determination of "copyrightability," the decisionmaker must focus upon alternatives that coun-

sel may suggest, or the court may conceive, *along the scale from the most generalized conception to the most particularized,* and choose some formulation—some conception or definition of the "idea"—for the purpose of distinguishing between the idea and its expression.

. . . . .

SECOND, the decisionmaker must focus upon whether an alleged expression of the idea is limited to elements essential to expression of *that* idea (or is one of only a few ways of expressing the idea) or instead includes identifiable elements of expression not essential to every expression of that idea.

THIRD, having identified elements of expression not essential to every expression of the idea, the decisionmaker must focus on whether those elements are a substantial part of the allegedly copyrightable "work."

*Id.* at 60–61.

In reaching this conclusion, I have fully considered *amicus curiae* briefs filed in this case, with leave of court. Compared with the great majority of *amicus curiae* briefs filed in courts, two of the *amicus* submissions in this case are distinctive: they do not purport to advise the court how the present case should be decided, and they are not filed on behalf of clients who have a special interest aligned with that of one or the other of the parties to the case.[2] The *amicus* submission of the Register of Copyrights concerns issues that I do not reach in this Memorandum, and I do not discuss it further.

The second *amicus* submission was filed by eleven professors of law, teachers of courses in the intellectual property field, who express a concern that the Opinion in *Lotus v. Paperback* and the standard of decision developed in that Opin-

---

**2.** A third *amicus* brief filed by the Software Entrepreneur's Forum does take the position that Quattro and Quattro Pro ought to be determined not to infringe Lotus' copyright. However, that brief suggests findings that ought to be made rather than the legal rule that must be applied. Because the court does not make findings on motions for summary judgment, and even as to other matters addressed in this Memorandum I am not making findings, I do not address that brief further.

ion, quoted above, give inadequate attention and emphasis to the distinction between a copyrightable expression and a useful process. Although this distinction is noted in the *Lotus v. Paperback* Opinion— *e.g.*, 740 F.Supp. at 53–58—I accept the point that no explicit reference to "process" appears in the standard of decision quoted above. Because I recognize the value of reminding decisionmakers (whether judges or jurors, a point to which I return later in this Memorandum) of the distinction between a useful process and an original expression, I will add a reference to that distinction, restating the standard in the following way:

> FIRST, in making the determination of "copyrightability," the decisionmaker must focus upon alternatives that counsel may suggest, or the court may conceive, along the scale from the most generalized conception to the most particularized, and choose some formulation— some conception or definition of the "idea," "*system*," "*process*," "*procedure*," or "*method*"—for the purpose of distinguishing between the idea, *system, process, procedure, or method* and its expression.

> . . . . .

> SECOND, the decisionmaker must focus upon whether an alleged expression of the idea, *system, process, procedure, or method* is limited to elements essential to expression of that idea, *system, process, procedure, or method* (or is one of only a few ways of expressing the idea, *system, process, procedure, or method*) or instead includes identifiable elements of expression not essential to every expression of that idea, *system, process, procedure, or method.*

> THIRD, having identified elements of expression not essential to every expression of the idea, *system, process, procedure, or method,* the decisionmaker must focus on whether those *expressive* elements, *taken together,* are a substantial part of the allegedly copyrightable "work."

*Id.* at 60–61 (added words emphasized, other emphasis deleted). If the answer to the THIRD step is YES, then the expressive elements of the work, taken together, are copyrightable. Copyright protection extends, of course, only to the expressive elements—not to anything more. To demonstrate entitlement to relief, Lotus will be required to prove that Borland copied expressive elements (that is, the particular form of expression and not just the methodology, process, or idea of the user interface of Lotus 1–2–3) and that as a result there is a substantial similarity (in the mixed law-fact evaluative sense) between expressive elements of 1–2–3 and an allegedly infringing Borland program.

I need not and do not tarry over whether this refinement of the stated standard of decision simply makes explicit something that was implicit in *Lotus v. Paperback* or instead is a modification of the standard stated there. In any event, laboring as I am in territory that is uncharted, I conclude that the sources of authority I am bound to respect—constitutional, statutory, and decisional—leave me the choice and perhaps even the responsibility to make this refinement and to do so explicitly.

Apparently, if not explicitly, a premise of Borland's argument is that once some aspect of a "computer program" (as that phrase is used in the statute, 17 U.S.C. § 101) is determined to be a "process" or "system" (as those words are used in the statute, 17 U.S.C. § 102(b)), no part of that functional aspect is copyrightable. (It is not entirely clear whether the argument is that anything "functional" is not "expressive," or instead that even "expressive" elements of anything that is "functional" are not "copyrightable." The choice between these two different ways of phrasing the argument seems, in any event, more linguistic than substantive.) Once functionality is demonstrated, Borland argues, the inquiry about copyrightability ends, and no copyright is possible. This premise of Borland's position is flawed.

█ The Professors' Amicus Brief might be interpreted as implicitly if not explicitly supporting Borland's premise. In any event, Borland broadly asserts that "all systems are uncopyrightable." Docket

No. 141, at 94. Of course, if Borland means only that being a "system" does not make something copyrightable, the point is plainly meritorious but does not help one decide a case such as this one. But Borland appears to be asserting more—that if some part of a computer program is a "system, process, procedure, or method," 17 U.S.C. § 102(b), no copyright of any aspect of that part of the program is possible. If, in so arguing, Borland means that the fact that a computer program is a "system" precludes copyrightability of every part and aspect of that program (or even that if some part of a program is a "system," copyrightability is precluded as to all aspects of that part) the argument is deeply flawed. *See Kieselstein–Cord v. Accessories By Pearl, Inc.*, 632 F.2d 989 (2d Cir.1980) (holding that expressive elements of utilitarian belt buckles were copyrightable). The fallacy becomes apparent as we examine more closely the proposed bright-line rule that "all systems are uncopyrightable." Even source code and object code would not be copyrightable if this rule were the law.

It is worth noting that in this discussion I do not depend upon judicially or academically developed conclusions about fundamental truths, even though the basic nature of copyright law is relevant. Rather, the central point is that because courts are bound by the congressional mandate that something in computer programs is copyrightable, I must reject Borland's premise. Of course, if Congress should at some future time determine that the balance it has struck with respect to the copyrightability of computer programs is not in the best interests of the programming industry and the public, Congress (but not this court) is free to change that balance.

In discussing this issue, as shorthand for convenience only (and with readiness to reconsider should it be suggested that the shorthand has different substantive implications from the longer phrase), I will use the term "process" to refer to "system, process, procedure, or method" as that phrase is used in the statute.

"Process," like "idea," is an abstraction—a creature of the human intellect. A machine may be constructed of pieces of metal, wood, plastic, and other materials, put together with nuts, bolts, bearings, and adhesives. A process, on the other hand, is not composed of materials. Instead, it is a set of ideas about how to do something. The fact that it is an idea about doing does not make it any less an idea.

Patent law establishes legal rules for process patents that are different in some respects, and not in others, from the rules applying to other patents. The mere fact that patent law allows a means of legal protection for a process, however, does not establish that there is not also some protection in copyright law. Certainly the area of legal protection under the separate legal regimes is not co-extensive, but it is equally clear that there is no particular reason to believe there should never be any area of overlap. Indeed, precedent recognizes some overlap. *E.g., Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954) ("We do hold that ... patentability ... does not bar copyright...."). Thus, the fact that a particular computer program may be protected to some extent under one of these legal regimes does not mean it cannot be protected to any extent under the other.

Thinking about copyright protection for computer programs may begin with the point that a person who conceives a "process" shows or tells—uses some form of communication—to make the "process" accessible to another. Showing and telling are modes of expression.

Thus, there is a closely analogous if not precisely identical dilemma about distinguishing an idea from expressions of the idea and a "process" from expressions of the "process." I need not, and do not, repeat here the explanation of that dilemma and of statutory and decisional markers that led me in *Lotus v. Paperback* to the formulation of a standard to be applied to the facts of a particular case to decide whether an aspect of a computer program is a copyrightable expression.

In a broad sense of the term "process" (or the longer phrase for which it stands here), every aspect of a "computer program" is part of a process. Nevertheless, we have a statutory mandate that some aspects of a "computer program" may be copyrightable. Borland and virtually all others who discuss the matter recognize that "source code" and "object code" have copyrightable elements. Yet each "code" is surely a part of a "system, process, procedure, or method." Imagine the response you would receive from a good programmer if you told her that her "source code," or "object code," or both, lacked "system" and "method" and, either taken together or separately, simply could not be regarded as an effective "process" or "procedure" for communicating to the computer what it should do!

Bowing to the congressional mandate and to widely expressed views about the copyrightability of code, Borland—after full explication of a proposed interpretation of *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879), and its progeny—continues with the point that the "long-standing copyright principles" applicable to novels, poems, and other traditional literary works have been applied also to computer programs to provide significant protection to software developers.

> For example, under those long-standing principles, *the sequence, structure and organization of the program's code,* in addition to the text of the code itself, *may be protected by copyright*— under the same rationale that protects the detailed plot line and structure of a play in addition to the play's actual dialog.

Docket No, 141 (emphasis added). Borland also concedes, as it must, that this protection of the sequence, structure, and organization may extend to the user interface as well as source code and object code.

Borland's flawed argument (for a brightline rule that a finding of "process" defeats "copyrightability," regardless of the originality of any particular expression that enables a person other than the creator to use it) must be rejected because it is fundamentally inconsistent with the congressional balance struck in the Copyright Act. The argument is in its nature a one-conclusive-element argument. Expressed in the form of if-then logical operations of the sort a computer might execute upon pairs of binary values, such an argument asks the court to conclude (a) "if process, then not copyrightable," (b) "if idea, then not copyrightable," and (c) "if patent protection for process, then no copyright protection for process." Arguments of this type, urging courts to adopt an overriding rule that one element of a total set of interwoven circumstances be declared the only legally relevant element are like discredited arguments that courts should select one among all the antecedents of an event in human affairs and declare it to be *the* proximate cause. *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* 266 (5th ed. 1984). These are arguments that one aspect of the total circumstances be treated in law as overriding and conclusive. Arguments of this type are often encountered in the legal system, but far less often sustained. Common sense tells us that life and life's experiences are not so neatly separated into discrete categories, without overlap. The legal system aims at reasonable accommodations among conflicting legitimate interests and rarely holds that one such interest totally overrides all others. Moreover, in the present context, respect for the congressional mandates in the Copyright Act requires that Borland's proposed bright-line rule be rejected.

Borland's argument that *Baker v. Selden* adopted a brightline rule that governs this case is a gross overstatement not only of what the Supreme Court *did* in that case but as well of what the Court *said.* The Court did not there face the issues presented in the present case. Indeed, the Court did not even address issues of expression within the plot, sequence, organization, or structure of artistic works—issues that were addressed by Learned Hand in his opinions from which I took guidance in deciding *Paperback.*

Attributing to the Supreme Court one's own extrapolations beyond what the Court did and said is a form of reasoning a lower

court should not adopt. It is wiser and more in keeping with the judicial role to recognize candidly that we, not the Justices of the Court, are doing the extrapolating. In hearing and deciding *Baker v. Selden* in 1879 the Court did not, and indeed could not, foresee computer programs. The Court was not speaking about computer programs or even about the kinds of issues, more readily inferred to be foreseeable in 1879, that were explicitly addressed in Learned Hand's opinions a half-century later and beyond. Attributing to the Court's decision in 1879 conclusions that counsel or courts may draw today from *Baker v. Selden* by extrapolation is being less than fully candid about the extent to which decisions must be and are being made today. Nor can we attribute to Congress, in its much more recent action, a manifestation of intent drawn from a supposed legislative history arguably appearing in a CONTU report to Congress. Congress speaks primarily by what *Congress says* formally by its enactment. Even though legislative history regarding expressions *by* members of Congress during the legislative process is sometimes used by courts in aid of determining the meaning of the formal enactments of Congress, there is no support for treating as legislative history what another person or entity says *to* Congress. Thus, to be candid about what we are doing and faithful to congressional as well as precedential guidance, we cannot say that *Baker v. Selden*, or the CONTU Commission's interpretation of that decision, established a bright-line rule, "if functional, not copyrightable." As with "causation," we must delve more deeply to understand such concepts as "process," "expression," "copyrightability," and "substantial similarity."

## B. Drafting a Jury Interrogatory to Test Its Viability

In deciding copyrightability issues in the present case I will apply the standard formulated in *Lotus v. Paperback,* with the refinement described above to take account of the concern appropriately expressed in the Professors' Amicus Brief. If "copyrightability" is to be submitted to the jury, then Question 2 of a Verdict Form in which Question 1 concerned copying might read as follows:

### Question 2

In answering this question, you are to apply the following legal standard:

FIRST, in making the determination of "copyrightability" of the user interface of 1-2-3 as a whole, or of some element or elements of that interface, focus upon alternatives that counsel may suggest, or that you may conceive, along the scale from the most generalized conception of that user interface, or some element or elements of that interface, to the most particularized, and choose some formulation—some conception or definition of the "idea," "system," "process," "procedure," or "method" of the interface, element, or elements—for the purpose of distinguishing between the idea, system, process, procedure, or method and its expression.

SECOND, focus upon whether an alleged expression of the idea, system, process, procedure, or method is limited to elements essential to expression of that idea, system, process, procedure, or method (or is one of only a few ways of expressing the idea, system, process, procedure, or method) or instead includes identifiable elements of expression not essential to every expression of that idea, system, process, procedure, or method.

THIRD, having identified elements of expression not essential to every expression of the idea, system, process, procedure, or method, focus on whether those expressive elements, taken together, are a substantial part of the allegedly copyrightable "work." If they are, then you will find those expressive elements, and no more, copyrightable.

Applying this standard, do you find by a preponderance of the evidence that the user interface of Lotus 1-2-3 contained copyrightable elements?

＿YES ＿NO

As one considers this option, it becomes immediately apparent that its effect is to give the jury virtually uncontrolled discretion. Prohibitions against probing into

jury deliberations—*e.g.*, Fed.R.Evid. 606(b)—would preclude courts from determining whether a jury understood and correctly applied the court's explanation of the standard in its charge to the jury. The only judicial control against improper verdicts would be in decisions whether or not to direct a verdict and whether or not to grant a motion for judgment notwithstanding the verdict.

Might counsel and the court devise some greater measure of assurance that the jury understands and faithfully applies congressional directives regarding the scope of copyright protection for computer software programs? Would it be a step in that direction to use the foregoing formulation as part (a) of a question, with something like the following as part (b)?

(b) If YES, is each of the following a part of the user interface in which you find expressive elements, which you also find to be at least part of the basis for your answering YES to Question 2(a)?

| | | |
|---|---|---|
| (1) The menu commands | ____YES | ____NO |
| (2) The menu structure | ____YES | ____NO |
| (3) The command sequence | ____YES | ____NO |
| (4) The long prompts | ____YES | ____NO |
| (5) The macro facility | ____YES | ____NO |
| (6) The overall appearance of some part of the user interface | ____YES | ____NO |

Answers to the subparts of a question of this kind might at least enable a court, after verdict, to give somewhat more reasoned consideration to the relevance and validity of an argument—such as is advanced by Borland here—that, as precedent, *Lotus v. Paperback* should be limited by the finding that Paperback copied the "user interface as a whole," and that the present case is materially different because here, even if the facts are construed most favorably to Lotus, Quattro and Quattro Pro are substantially similar to less of the user interface of Lotus 1–2–3 than was VP Planner. (I do not now determine the validity of this argument.)

Even if an addition such as part (b) might be useful in some circumstances, however, it would not eliminate, or even substantially mitigate, another serious problem to which I turn next.

### VII. *Should Any Copyrightability Issues Be Submitted to a Jury?*

Is a fact question bearing upon copyrightability to be submitted to a jury if a timely demand for jury trial has been filed and the fact is genuinely in dispute—that is, reasonable persons might differ about the answer to the question?

Though debated often, as yet this question has not been explicitly answered either by statute or by precedents. Cases that arguably bear upon the question can at the least be distinguished on the facts and thus do not speak directly to the precise kinds of copyrightability issues that are presented in this case. *E.g., Kregos v. Associated Press*, 937 F.2d 700 (2d Cir.1991) (reversing summary judgment on issue of "creativity"). *Kregos* did not involve the distinctive entanglement problems that are presented in computer-program copyrightability cases.

In *Lotus v. Paperback*, even though the question as to whether copyrightability might be a jury issue had been discussed extensively in pretrial conferences, the court was not required to and did not decide it. The parties removed it from contention by entering into a stipulation. As part of an agreement for a phased trial in which Phase One was to be before the court without a jury, the parties to that case stipulated that any fact question rele-

vant to copyrightability would be decided by the court. No such stipulation has been made in this case, and I now address the issue.

### A. Role of Judge, Jury, and Witnesses

The legal test for determining copyrightability both as formulated in *Lotus v. Paperback* and as refined in Part VI, above, is a standard requiring an evaluative mixed law-fact determination, as distinguished from a bright-line rule calling for a finding about disputed historical facts such as who did what, where, and when. Moreover, this standard is far more heavily loaded with public policy implications than most other standards more commonly used in law, of which the negligence standard is an example. Juries applying the copyrightability standard would not be required or even permitted to explain their reasoning. They would be free as a practical matter to reach decisions inconsistent with the balance struck by Congress, as interpreted by the courts. Inconsistencies among verdicts could be expected to introduce a lawless element into the administration of justice in copyright cases, quite inconsistent with the aim of treating like cases alike.

 In the circumstances of a particular case, the answer to Question 2 (or any alternatives to Question 2 we might envision), is an essential premise of a reasoned application of the accommodation of conflicting policy interests reached by Congress in determining that computer software programs are copyrightable. For this reason, I conclude that the application of the standard to a particular case is a ruling more closely analogous to traditional judicial lawmaking to fill the interstices of statutes than to traditional factfinding. It is appropriately treated as a ruling of law. Thus, even if a court treats the answer to Question 2 as a "factfinding," the court may conclude also that the answer is a finding of a premise fact—a finding of a fact that serves solely as a premise for a ruling of law. *See* Robert E. Keeton, *Legislative Facts and Similar Things: Deciding Disputed Premise Facts*, 73 Minn. L.Rev. 1 (1988). Like a finding about

whether transporting gasoline on a public highway, or blasting with dynamite, or cropdusting, or building an earthen dam is an abnormally dangerous activity, *id.* at 19–20, 57–69, perhaps, this is a finding to be made not by juries, case by case, but by a lawmaker (Congress, to the extent that it can do so in broadly applicable statutory guidelines, and courts to the extent necessary to fill out details essential to application of those broad guidelines in particular types of cases).

The position that this kind of finding is a premise factfinding is supported also by the certainty that even if patterns of jury verdicts might develop over time and become sufficiently predictable to be reasonably described as part of the "law" of copyright, this element of the law would be developed undercover rather than, as is expected of lawmaking through judicial precedents, by "reasoned decisionmaking, candidly explained." Robert E. Keeton, *Judging* 1–2 (1990). Moreover, even if patterns were to develop sufficiently to enable lawyers to predict outcomes for clients with some confidence, still the patterns could not be employed to protect an individual litigant, plaintiff or defendant, against the harsh consequences of a deviant verdict.

The length and complexity of a jury trial of issues of copyrightability would be affected also by disputes regarding admissibility of opinion evidence. The affidavits submitted in this case by the parties, in support of their respective positions on the cross-motions for summary judgment, present what is in essence a clash of policy arguments by experts. Moreover, an impartial factfinder may reasonably infer that the policy positions the experts advance correlate better with their respective views about what the law of copyrightability should be than with considered opinions about the policy accommodation Congress has struck and courts and juries are bound by oath to respect. This point is supported by the following passage from Borland's Memorandum (Docket No. 141):

> More importantly, Borland's witnesses include distinguished industry executives

who have years and years of actual experience in bringing software products to market. Galler [a Lotus witness], in contrast, can only theorize and speculate about such issues. Unlike Galler, Borland's experts can authoritatively discuss the consequences to software development of the untoward extension of copyright law Lotus seeks in this case.

*Id.* at 28. Thus, the affidavits of experts submitted to this court for consideration in ruling on the motions for summary judgment are aimed more at persuading this court to a view of the law than to the existence or nonexistence of a genuine dispute of fact.

If copyrightability is held to be an issue for jury determination, courts and counsel must work out answers to extraordinarily difficult issues regarding admissibility of opinion evidence.

■ No provision of the Copyright Act declares explicitly that issues of fact bearing on copyrightability shall be submitted to juries, or instead shall be decided nonjury. Nor does the Constitution, including the Seventh Amendment. Thus, the answer to the question who shall decide such issues must necessarily be fashioned by courts. Courts are not free, however, to fashion whatever answers they may deem best. They must, instead, seek answers consistent not only with the explicit constitutional and statutory mandates but also with the implications of those mandates for other issues not explicitly addressed. A determination that issues of copyrightability are to be resolved by juries would have such severe adverse effects on the aim of assuring that like cases are treated alike and on the complexity and cost of litigation in computer software copyright cases that in practical effect the scope of copyright protection congress manifestly intended could not be achieved. The practical certainty of many outcomes inconsistent with the congressional accommodation among highly valued but conflicting interests, manifested in the Copyright Act, weighs heavily in favor of the conclusion that treating copyrightability issues as exclusively for courts, not juries, at least in

computer software cases, is the decision more compatible with the congressional mandate. So also does the object of avoiding the practical certainty of increased length, complexity, and cost of litigation.

For all these reasons, I reach the tentative conclusion (which I will be prepared to reconsider as explained in Section B, below) that at least in the circumstances of this case (and probably more generally, though I need not so determine here), the issue or issues of copyrightability, including any fact questions bearing upon them, must be determined by the court, not the jury.

### B. Reconsideration

Part II, above, alludes to the value of thinking seriously about the framing of jury questions and instructions well in advance of trial because the attempt to do so helps sharpen the focus on issues that are best considered early in the history of the case. Part VII–A tentatively determines that copyrightability issues in this case are to be determined by the court, not the jury. Before so ruling finally, however, I will allow each party an opportunity to submit a proposed draft of any question bearing on copyrightability that it contends, even in the alternative, is a question that should be submitted to the jury. If the draft question uses legal jargon rather than plain English only, the draft must be accompanied by proposed instructions to the jury explaining the jargon. Submissions and responses may be filed on the schedule set in the Order below.

### C. Ambiguity of the Parties' Contentions Regarding Copyrightability

It is not now apparent which individual elements of 1–2–3 the plaintiff (Lotus) alleges to be copyrightable, nor has either party made clear its contention about what aspects of various elements of the 1–2–3 user interface are or are not expressive aspects.

Lotus' Statement of Material Facts as to Which There is No Genuine Issue Pursuant to Local Rule 56.1 (Docket No. 149) includes the following paragraphs:

32. The selection of which, and how many, commands to place in each menu level, and the organization of the successive menu levels into a coherent and intuitive menu structure, was an important and creative consideration in the development of 1–2–3. 1–2–3's creators, particularly Mr. Kapor, devoted substantial effort during the late stages of the program's development to selecting the words and structural organization for 1–2–3's menus. (Kapor Aff., ¶¶ 72–101.)

33. Thus, the 1–2–3 menu commands, their organization and sequence, the 1–2–3 menu tree, and the overall user interface reflect an original expression of a spreadsheet program. This expression is not dictated by functional constraints and contains a significant degree of communicative content to the user. (First Galler Dec., ¶ 207.)

*Id.* at ¶¶ 32, 33.

Borland responds that paragraph 32 is uncontested and immaterial and that paragraph 33 is contested or non-factual. Borland adds, *inter alia*, that "[t]he suggestion in the first sentence of No. 33 that the 1–2–3 commands and command hierarchy represent copyrightable 'expression' is not a statement of fact but rather constitutes an asserted conclusion of law," which Borland disputes. Even though contending that this is an issue of law, Borland has nevertheless resisted trying it separately and first. Thus, I understand Borland's position to be that if the court does not decide this issue for Borland as a matter of law, Borland wishes not to be foreclosed from contending, in the alternative, that copyrightability in general, and this issue in particular, should be submitted to the jury.

I conclude that a decisionmaker (judge or jury) cannot determine the answer to the dispute over Lotus' ¶ 33 without making an evaluative application, to this case, of the standard formulated in Part VI of this Memorandum. One might reasonably argue that an issue such as this, if one for determination by the court, can properly be decided on motion (or cross-motions) for summary judgment, even if the issue is one

on which reasonable persons may differ in the circumstances of this case. Nevertheless, even without so deciding now, I conclude that on the present submissions I am left with a sense that this is a genuinely disputed and debatable issue. Unless one of the parties can persuade me otherwise in further submissions permitted by the attached Order, I will leave this issue to be decided on a full record developed in a first phase of trial, and with the benefit of a sharper focus than present submissions accomplish as to precisely what issues of fact and law should be decisive of this case.

In particular, the dispute between the parties regarding paragraph 33 is one I cannot decide on the present submissions. If the menu commands or menu command structure were dictated solely by functional concerns, then those elements may not be copyrightable. *See Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1145 (2d Cir.1987) ("conceptual separability" test examines whether expression exercised independent of functional influences). But the mere fact that functional concerns were influential does not establish that no copyrightable expression appears in the menu commands, the command structure, or elsewhere in the user interface.

## VIII. *Substantial Similarity Revisited (Illicit Copying)*

It is not enough that an allegedly infringing work contain matter copied from a copyrighted work. Lotus must demonstrate that similarities between the works are substantial. However, not all similarities may be taken into account. For example, the fact that both programs are spreadsheet programs renders them substantially similar in many respects. Nevertheless, such similarities may form no part of a conclusion that the works are substantially similar in the mixed law-fact evaluative sense—that is, for purposes of assessing *illicit* copying—because the idea (or process) of a spreadsheet program is not copyrightable. It is naturally to plaintiff's advantage to place as many copyrightable elements before the court and jury on the issue of substantial similarity as possible not only because the sum increases with

each added element but also because the whole may be more than the sum of its parts. Therefore, a determination as to which elements of Lotus 1–2–3 are copyrightable, alone or together, is interwoven with the issue of substantial similarity.

On the other hand, as I have concluded above, it is by no means apparent that all copyrightable elements of 1–2–3 have been copied in the Quattro programs. Lotus, presenting as its primary contention that *Paperback* is controlling, has not formulated for the court or for Borland its precise contentions (in the alternative to its contention that the user interface as a whole was copyrightable and was copied) as to which elements of 1–2–3, separately or in combination, were copyrightable and were copied.

Borland, on the other hand, at points in its submissions, appears to contend that it is entitled to summary judgment both on the issue of substantial similarity and on the issue of copyrightability because if anything at all in a computer program's user interface is copyrightable it is only the user interface as a whole, and the elements of the Quattro and Quattro Pro user interfaces that are like elements of the Lotus 1–2–3 interface are only a very small part *of the Quattro and Quattro Pro user interfaces.* This is an argument not likely to prevail in any court. Copyrightability is determined by the characteristics of the allegedly protected work, not by the characteristics of the allegedly infringing work. A copier who incorporates a copyrighted short story of twenty pages length into a multi-volume set of books will not get far with the contention, in litigation between the copyright owner of the short story and the copier, that the short story is not copyrightable because it is such a small part of the multi-volume set. Nor will the copier win on the substantial similarity issue by showing that although the entire copyrighted work was copied it constituted only a very small part of the overall set of books produced by the copier.

I need not and do not rule at this time on the appropriate framing of the issues that must be decided in this case about the legal significance that may attach to findings of fact about the disputed scope of similarities between the user interfaces of the different works. To say the least, however, Borland is not entitled to a summary judgment on this extraordinary ground it appears to be asserting.

If Borland responds that I have misinterpreted its submissions and it did not mean to assert such an extreme position, its future submissions regarding precisely what questions it proposes to submit to the jury and what expert opinions it proposes to proffer may clarify its contentions. As to opinion testimony, it seems likely indeed the court should preclude the expression in the presence of a jury of an opinion that "substantial similarity" does not exist when the elements of the user interfaces that are alike constitute only a small percentage *of the allegedly infringing product.* Whether that is correct or not is not a question of fact on which expert opinion may properly be placed before a jury.

The argument that a little copying—beyond "fair use," 17 U.S.C. § 107—here and there in a very large work should be allowed to promote the development of great works is a policy argument Congress has rejected. It should not be heard by a jury. The issue is one of law as to which the court will receive arguments of counsel, outside the presence of the jury, both to determine the scope of admissible opinion testimony and to determine the framing of questions of fact to be submitted to the jury.

Neither, on the other hand, will the jury hear the argument that copying just the menu terms, or just the menu structure, or just a command sequence, is enough to establish infringement. Whether this is so or not is a question of law to be argued to the court, not the jury. To the extent that strictly factual answers from the jury may be helpful to the court and counsel to focus the legal issues to be argued, however, questions may be framed to elicit those answers.

## ORDER

For the foregoing reasons, it is OR-DERED:

(1) The cross-motions for summary judgment (Docket Nos. 30 and 87) are denied.

(2) Renewed motions for summary judgment may be filed by April 10, 1992 and responses by April 20, 1992.

(3) Submissions of both parties pursuant to Part VI of the foregoing Memorandum shall be filed on the schedule in (2).

(4) The several motions regarding the submission of confidential materials (Docket Nos. 140, 156, and 160) are dismissed as moot.

A conference to consider all pending matters and to set a trial date is scheduled.